## DORRIS vs. GRACE.

The rights of the owners of slaves, not within the lines of the military occupation of the United States during the late war, were in no wise affected or impaired by the proclamation of the president, of the 1st of September, 1862, commanding that all slaves in the state should be free from and after the first day of January, 1863.

The act of congress of the 3d of March, 1865, does not repeal the act of the 30th of June, 1864, so as to take away the right of the plaintiff, at any time before offering in evidence an unstamped writing obligatory sued on, to affix a revenue stamp to it in the presence of the court, where such stamp has not been omitted with intent to evade the provisions of the act.

A writing obligatory when stamped, as prescribed by the act of congress, in the presence of the court, is valid from its date.

Where a case is submitted to a jury, without objection upon no issue, or an informal issue—as where the defendant pleads a good plea in bar, and the plaintiff "puts himself upon the country" instead of answering the plea—and the parties have had a fair trial with the benefit of his evidence applicable to his plea, and the finding is consistent with right and justice, this court will not disturb the judgment, but under the statute consider the pleadings as amended.

*Appeal from Jefferson Circuit Court.*

Hon. WM. M. HARRISON, Circuit Judge.

CLARK, WILLIAMS & MARTIN, for the appellant.

The question raised upon the demurrer to the first plea, is, did the proclamations of the president of September 1st, 1862, and January 1st, 1863, operate to make the negro free so that would cease to be a valid consideration for a contract. It is suggested that the president, as commander in chief of the army, and a military necessity existing, might in the absence of law make his wish the law of the land. See *Acts of July 29th* 1861; 2 *Brightley's Dig.,* 192; *Pro. of Sept. 1st.,* 1863; 12 *Stat. at Large,* 1267; *Act of July* 17, 1862; *Stat. at Large,* 591; *Brightley's Dig.* 199, 200.

The contract was void by law, having never been stamped; and the court had no power to permit it to be stamped at the trial, so as to make it valid, and surely none to make it relate back and become valid *ab initio. See the Stamp Act of 3d March,* 1865; 2 *Brightley's Dig.,* 265, *secs.* 252, 25, *page* 266. *Gibson vs. Hibbard,* 13 *Mich.,* is against this position.

The want of a replication to defendant's second plea is not cured by verdict, by Stat Henry 8th, ch. 30. See *Tidd's Prac.,* 835; *McMechan vs. Hoyt,* 16 *Ark.,* 303; *Bac. Abr. title Pleas & Pleading, G.,* 2; *Taylor et al. vs. Coolidge,* 17 *Ark.* 456.

RICE for the appellee.

In time of peace, the president with or without the sanction or authority of congress had no power to issue a proclamation free-

ing the slaves; but as commander in chief of the army he had the power, during the war, to issue any military order authorized by the usages of modern warfare, which the circumstances required; but no military order or proclamation issued by him could have effect over persons or property not within the lines of military occupation but within the lines of the enemy and over which they had exclusive control. *Lawrence's ed. of Wheaton's Int. Law, page,* 604 *and notes.*

Personal property within the enemy's country may be taken by military order for use of the army, and the owner's title thereby divested. *Mr. Alexander's Colton,* 2 *Wallace,* 404; but the right of the owners cannot be divested or impaired until actual seizure and appropriation.

There was what was styled a replication to the second plea: and though it was defective, the parties went to trial without objection, as upon issue to the plea. This comes under and is covered by *sec.* 36, *ch.* 134, *Gould's Dig.*

Mr. Chief Justice WALKER delivered the opinion of the court.

Grace brought his action of debt against Dorris upon the following instrument:

" One day after date I promise to pay W. P. Grace or order, the sum of three thousand dollars, with ten per cent. interest thereon for value received of him. Witness my hand and seal this August 29th, 1863.

GARLAND H. DORRIS, [Seal.]"

In defence of the action brought upon this note, the defendant, Dorris, filed four pleas. The first of which was as follows:

" Comes the said defendant and defends the wrong and injury when, etc., and says *actio non,* because he says that the said writing obligatory was given for the consideration of a certain negro man by the said plaintiff sold to defendant, and for no other consideration whatever, and the said defendant in fact saith, that heretofore, to-wit: on the first day of September, 1862, Abraham Lincoln, then president of the United States, issued his proclama-

tion commanding that, from and after the first day of January, all slaves in certain states, including the state of Arkansas and county of Jefferson, where said slave was sold, should be and were free from and after the first day of January, 1863, by order of which the said negro was not a slave for life, but on the contrary, was a free man, and said defendant procured from said plaintiff no property in the labor of said slave, or right to control his person, and the said contract was made in violation of the said proclamation, and in violation of the law of the land, and the consideration of said writing obligatory is illegal and void, and the said defendant is ready to verify, etc."

To this plea the court sustained a demurrer, and its legal sufficiency is thus presented for our consideration.

The defendant insists, that the negro slave sold by Grace to him was, by force of the proclamation of President Lincoln, made on the first of January, 1863, free, and not property subject to sale, and that, therefore, the writing obligatory was given without consideration.

The effect which the proclamation of the president had upon the rights of the owners of slaves held as such within the limits of the territory actually occupied by the federal army, and consequently within its lines, is not now before us for consideration, because it is not averred in the plea, the legal sufficiency of which we are now considering. And, therefore, the precise question before us, and which we will proceed to determine, is as to the effect of the president's proclamation upon the rights of the owners of slaves, who resided with them beyond the lines of occupation of the federal army.

We are clearly of opinion, under such circumstances, that the rights of the owners of slaves were in no wise affected, or impaired by the proclamation of the president. For whether we consider the proclamation as issued by him in virtue of his authority as the head of the military of the nation, in the exercise of all his military powers in time of war, or as enlarged by act of congress for the purpose of enabling him the more effectively to

conduct the war to a favorable issue, it could in no wise affect the rights of property in slaves—a right fully recognized by the constitution of the United States, and settled by the highest judicial tribunals of the nation.

It is a matter of public history that eleven of the American states had assumed the right to dissolve their connection with the federal government of the United States and to establish for themselves a separate and independent government. This attempt was held by the government of the United States to be revolutionary and rebellious, and the military forces of the nation had been called out to suppress it. It was under these circumstances, and after repeated conflicts in arms, that the proclamation was addressed by the chief executive of the nation to the people of the states in rebellion, commanding of them obedience and denouncing, as a penalty for disobedience, the emancipation of their slaves. The proclamation was, evidently, intended as a war measure, issued under his military power as commander-in-chief in time of civil war. We cannot suppose that the president assumed to act in any other capacity, because such act would be clearly unconstitutional. Slaves were property, so recognized by an express provision of the constitution, and so decided by the supreme court of the United States. As a war measure it may have been, and was, probably, intended to act upon the fears of the slave-holders (who had long had a well grounded apprehension that their slave property, if not wrested from them, would be rendered insecure and comparatively worthless,) and by threats to induce them to return to their allegiance to the government of the United States. But beyond this, it could only be available as an indication of executive will, or as directory to the military forces who were invading the states assumed to be in rebellion. It could only be made available to the limits of the federal lines—was enforced by the military, whose lines were its limits; and whose strong arm was essential to its efficacy: because, at the time when the proclamation was issued, the power and authority of the United States government had been suspended

beyond such limits, and the territory was then claimed and held as part of an independent government, foreign to that of the United States. And the laws having been suspended, it could in no event extend beyond its lines of occupation. But even if such had been the case, we are at a loss to conceive upon what principle of right, the property in slaves could be divested by force of a mere proclamation, emanating, even, from the chief of the executive department of the nation. Captured property in time of war, stands upon quite a different footing. But we deem it unnecessary to argue this question at any length, as we have recently decided all the questions of law that may have a bearing upon this precise point in the case of *Hawkins vs. Filkins.*

In this case, the enemy had not extended his lines to Pine Bluff. The negro had neither been within the federal lines, nor captured. The title of Grace was, therefore, as perfect as if no such proclamation had issued, and the plea which was based upon a supposed defective title, presented no bar to the plaintiff's recovery. The demurrer to it was therefore properly sustained.

The third plea presents, substantially, the same question as that decided at the present term of the court, in the case of *Julia Roane vs. Green and Wilson,* and upon the authority of which we will hold the plea insufficient.

A demurrer was also filed to the fourth plea, which was by the court sustained. The defence set up in the plea was, that the writing obligatory, upon which suit was brought, had not been stamped as required by the act of congress. The writing obligatory was executed on the 29th day of August, 1863, and remained unstamped until the 11th day of December, 1865, at which time it was duly stamped in the presence of the court.

It is contended by the counsel for the defendant:

*First.* That the act of congress of the 3d of March, 1865, in effect, so far repealed the act of the 30th of June, 1864, as to take from the court, or officer (as therein provided,) the power to permit instruments executed prior to the first of August, 1864, to be stamped. And *Second.* That if such power is given, when so

stamped the instrument could only take effect, as a valid instrument, from the time when the stamp was affixed to it, but did not relate back, so as to make it valid from its date.

By reference to the several acts of congress in regard to stamp duties, it will be found that under the first act, which took effect on the first of October, 1862, instruments executed prior to that date, were not chargeable with stamp duties; but, as the writing sued upon in the case before us was executed since that date and prior to the first of August, 1864, unless, as contended for by counsel, the act of 30th of June, 1864, was repealed by the act of the 3d of March, 1865, there can be no doubt but that the party had a right, at any time before offering the writing obligatory as evidence in the case, to affix a revenue stamp to it in the presence of the court. The act of 30th of June, 1864, provides: "That no deed, instrument, document, writing or paper, required by law to be stamped, which has heretofore been signed, or issued, without being duly stamped, or with a deficient stamp, nor any copy thereof, shall be recorded, or admitted, or used as evidence in any court, until a legal stamp or stamps, denoting the amount of duty, shall be affixed thereto, and the date when the same is so used or affixed, with his initials, shall have been placed thereon, by the person using or affixing the same; and the person desiring to use, or record any such deed, instrument, document, writing, or paper, as evidence, his agent or attorney, is authorized in the presence of the court, register or recorder, respectively, to affix the stamp or stamps thereon required. *Provided*, that no instrument, document, or paper, made, signed or issued, prior to the passage of this act, without being duly stamped, or having thereon an adhesive stamp, or stamps, to denote the duty imposed thereon, shall for that cause, if the stamp or stamps required shall be subsequently affixed, be deemed invalid and of no effect."

The great leading motive in this enactment was, not to embarrass, or impose terms upon the parties contracting: so far from this, it is the purpose of all legislation upon the subject, to encourage, uphold and maintain them when fairly made. The life of

trade demands this: but it is a revenue measure, and the penalties imposed upon a non-observance of its provision, were, evidently, intended to compel the use of stamps by parties contracting, and thereby increase the revenue. Bearing in mind this manifest intention, and in the light of it, looking into the subsequent act of the 3d of March, 1865, in which there is no repealing clause, we cannot believe that the act of 1864 was, by force of the act of 1855, by necessary implication, repealed. The first part of section 158 of the act of March 3d, 1865, after enumerating all the several contracts set forth in the act of 1864, and requiring that they shall be stamped, provides: "That if the stamp be omitted, *with intent to evade the provisions of the act*, the party so failing, shall forfeit the sum of fifty dollars, and such instrument, document or paper, bill, draft, order or note, not being stamped according to law, shall be deemed invalid and of no effect." This is the act [of the proviso to it, we will make reference hereafter.] Upon a careful examination of the act, it will be found that it is, in effect, a penal act, intended to throw safeguards around the laws then in force, not to repeal them: indeed it is difficult to conceive how it can be otherwise considered. It says, that if a party omit to stamp an instrument, or, if stamped, to cancel the stamp, *with intent to evade the provisions of the act*, he shall pay a fine of $50, and that the instrument so unstamped, shall be deemed invalid and of no effect. These are the penalties imposed. For what? Not simply for omitting the stamp, but for omitting it *with* "*intent to defraud.*" If there was no "intent to defraud," there would be no penalty. The instrument would still be admissible in evidence under the provisions of the act of 1864, or upon compliance with the further provisions made in the *proviso* of the act of 1865. No side issue could be made, upon an application to stamp, as to whether there was, or was not, an *intent to defraud* the United States out of the stamps required to be placed upon the instrument. This act is in limitation of the rights of the citizen, as well as penal in its character, and by well established rules, will be construed strictly.

We are sustained in our view of the proper construction of this act, by a recent decision of the supreme court of Iowa, as will appear from a late Digest of the decisions of that court: and it would seem, from the same authority, that it had been, also, held that a note executed prior to the act of 30th June, 1864, and stamped under the provisions of said act, is valid as if stamped at the time when it was executed.

And now with regard to the *proviso* of the act of 1865. We think, upon a fair construction of it, that so far from repealing the then existing laws, it was intended to extend to the party who had, from inadvertence, omitted to stamp a deed, or other instrument, additional facilities for complying with the law, by providing an additional tribunal before whom the instrument might be made valid, by affixing to it the proper stamp. Prior to the passage of the act of 1865, the party whose *instrument* was unstamped, could put the necessary stamp upon it, in the presence of the court, the register, or the recorder; by the *proviso* of the act of 1865, the party may also appear before the collector of the revenue of the proper district, and have a stamp affixed either with or without penal terms as may seem right to the collector.

The writing obligatory, then, having been stamped in the presence of the court, was valid, not from the day it was stamped, as contended for by counsel, but from its date. *Edwards on the Stamp Act, page* 237 ; *Brown vs. Savage, 5 Jurist, N. S.,* 1020. The court did not, therefore, err in sustaining a demurrer to the plea.

The remaining question presented for consideration, arises out of the action taken upon the second special plea of the defendant, to which issue was attempted to be taken by the plaintiff, and upon the trial of which by the jury, a verdict and judgment were rendered for the plaintiff.

The defendant's counsel insists that the replication of the plaintiff was, in effect, a nullity—presented no issue to be tried, and that in fact the plea stood wholly unanswered.

The plea presents matter which, if true, (and if unanswered

we must so consider it,) is a good bar to the action. It sets forth a total failure of consideration, in this, that the negro sold by Grace to the defendant, and in consideration of which he executed the writing obligatory in suit, was, at the time of the sale, and still is, a free man, and concludes with a verification. The plaintiff, instead of negativing this affirmative matter, or of confessing it and setting up new matter in avoidance, says: "he puts himself upon the country." For what purpose? There could be no necessity for calling a jury to try that, which, not having been denied, stood admitted to be true.

The counsel for the plaintiff concedes that there was no formal issue presented by the verification, but contends, that after verdict, this defect is cured by our statute of amendments.

The provisions of the statute are very broad. The 119th *sec. Dig., page* 863, provides : "That when a verdict shall have been rendered in any cause, the judgment shall not be reversed, or in any way affected, by reason of any mis-pleading, mis-continuance, discontinuance, insufficient pleading or mis-joinder of issue:" and it is provided in *sec.* 120, "That any such imperfections, not being against the right and justice of the matter of the suit, and not altering the issue between the parties on the trial, shall be supplied and amended by the court, when the judgment shall be given, or by the court in which such judgment may be removed by writ of error, or appeal."

Our former decisions have all given to this statute a liberal construction, and unless in this case the finding has been (in the language of the statute) against the right and justice of the matter of the suit, or alters the issue which was tried by the jury, it will become our duty to sustain the verdict and the judgment rendered upon it.

Upon reference to the state of the pleading, we find a good plea, which was, in effect, not replied to, or, at most, an informal and insufficient reply, to which no objection was made by the defendant, but which was treated, both by the parties and the court, as presenting an issue upon the facts stated in the plea, to

be tried by a jury, and and to try which a jury came, and after having heard the evidence, found a verdict for the plaintiff. Upon the trial, the defendant had the full benefit of his plea, his range of evidence was as full as if his plea had been properly negatived; and by reference to the evidence we find that it wholly failed to sustain his plea, and that the finding of the jury was correct. For what purpose, then, should this verdict be set aside? Surely no injustice has been done the defendant; he did not object, as he might have done, to the sufficiency of the replication; he has had the benefit of a fair trial upon all the evidence he produced, and from the state of case made out by him, has no right to complain of the result.

It is clear that, upon the whole record, there has been no error in the rulings of the court, and that the judgment is correct. And when such is the case, we have repeatedly held, that the judgment of the court below will not be disturbed. *Sweiptzer vs. Gaines et al.*, 19 *Ark. Rep.*, 96; *Tatum vs. Tatum, id.*, 199.

Upon the whole case, the law is clearly for the plaintiff, and although we think it not improbable that the defendant, at a time when slave property was of very doubtful value, did not intend to pay $3000 in cash for the negro, yet as he has, in reducing his contract to writing, used such terms as import a purchase for cash—as we have heretofore held—a court of law cannot depart from the established law of evidence to relieve him from the consequences of neglect, or inadvertency, should there have been such.

Let the judgment of the circuit court be affirmed.